Argued and submitted March 7, judgment of the Tax Court reversed May 26, 1994

THEATRE WEST OF LINCOLN CITY, LTD.,
an Oregon nonprofit corporation,
*Appellant,*

*v.*

DEPARTMENT OF REVENUE,
State of Oregon,
*Respondent.*

(OTC 3317; SC S40516)

873 P2d 1083

James C. Griggs, of Saalfeld, Griggs, Gorsuch, Alexander & Emerick, P.C., Salem, argued the cause and filed the briefs for appellant.

Ted E. Barbera, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent. With him on the brief was Theodore Kulongoski, Attorney General, Salem.

Barbee B. Lyon, of Tonkon, Torp, Galen, Marmaduke & Booth, Portland, filed a brief for *amicus curiae* Oregon Arts Advocates Foundation.

GILLETTE, J.

### GILLETTE, J.

In this tax case, we are called on to determine whether property owned by taxpayer Theatre West of Lincoln City, Ltd., is entitled to an exemption from *ad valorem* property taxation because taxpayer is a "literary institution," as that term is used in the *ad valorem* property tax exemption statute, ORS 307.130(1), set out *post*. The county assessor, the defendant Department of Revenue (the Department) and, finally, the Oregon Tax Court all held that taxpayer was not exempt. *Theatre West of Lincoln City, Ltd. v. Dept. of Rev.*, 12 OTR 479 (1993). Taxpayer appeals that ruling to this court. On *de novo* review, we hold that taxpayer is entitled to the exemption.

Our statement of the essential facts of the case, which are not in dispute, is a paraphrase of the statement of facts found in the opinion of the Tax Court. Taxpayer is a local theater company. It has one paid employee. All other work is performed by volunteer performers, crafts people, and others interested in promoting theater. Members of taxpayer select casts for plays, conduct rehearsals, design and construct sets, create costumes, apply makeup, operate lights and curtains, perform music, handle publicity for productions, and administer the business of the company.

Taxpayer provides significant benefits to the community. In addition to its regular performances, it provides benefit performances for organizations such as the hospital auxiliary, the city library, and a women's support center. Taxpayer averages approximately 10 benefit performances per year. Beneficiary organizations sell tickets for those performances at higher than normal prices; taxpayer donates its facilities and productions. Taxpayer also performs other community services, such as conducting classes on acting and theater production. It also provides assistance to local school drama groups and makes its facilities and supplies available to such groups without charge. Taxpayer also provides some tickets to its regular performances free of charge to those who cannot afford them.

Taxpayer claims exemption from *ad valorem* property taxation as a "literary institution" under ORS 307.130-(1)(a). That statute provides:

"(1) Upon compliance with ORS 307.162, [compliance with which is not an issue in this case,] the following property owned or being purchased by incorporated literary, benevolent, charitable and scientific institutions shall be exempt from taxation:

"(a) * * * [O]nly such real or personal property, or proportion thereof, as is actually and exclusively occupied or used in the literary, benevolent, charitable or scientific work carried on by such institutions."

The parties agree that the above mentioned statute requires two things in order for taxpayer to qualify for the exemption from *ad valorem* taxation as a "literary institution." First, taxpayer must be such an institution. Second, even if taxpayer is a "literary institution," it cannot qualify for the exemption unless a significant portion of its activities have a charitable objective. *See Behnke-Walker v. Multnomah County*, 173 Or 510, 520, 146 P2d 614 (1944) (so holding as to literary or scientific corporations). The parties (and the Tax Court) are in agreement that taxpayer meets this second requirement, as are we. Accordingly, we turn to an inquiry concerning the first requirement, *viz.*, that taxpayer be a "literary institution."

The Tax Court held that taxpayer did not qualify as a "literary institution":

"[Taxpayer] is not a literary institution. The term 'literary' does not include movies, theatre, television or opera. The term 'literary' refers to literature or written words. [Taxpayer's] purpose is not to promote good literature. Its purpose is broader. It may employ the written word, but it does so in speech or song, set in an artistically created background, costumed and accompanied by music. In the common and usual meaning of words, this is not the business of a literary society, but of a theatre."

*Theatre West of Lincoln City, Ltd. v. Dept. of Rev., supra*, 12 OTR at 483. The Department adheres to the foregoing analysis, urging this court to draw a distinction between that which is *read* — a book, a play, a poem, even a musical comedy or an opera — and that which is *spoken*. It is the verbalization, the Department insists, that deprives the activity of its "literary" nature and, derivatively, that deprives the institution that does the verbalizing of that same "literary" nature.

Certain consequences necessarily flow from the theory advanced by the Tax Court and the Department: An otherwise qualifying institution devoted to silent reading followed by open discussion of the plays of Shakespeare, Aeschylus, Euripides, Schiller, O'Neill, Hellman, or Miller could qualify for the exemption, but could lose its qualification if it chose to explore such plays fully by actually staging them. An institution whose members read and discussed Wouk's "The Caine Mutiny" could qualify; an institution that staged "The Caine Mutiny Court Martial" could not. An institution that discussed the speech of Henry V before Agincourt[1] could qualify, but an institution that wished to have that speech *heard*, in all its glory and in the context of the full play of which it is a part, could not. The foregoing consequences seem counterintuitive. We turn to an examination of the statute.

As with all cases involving the application of statutes, we are seeking in this case to carry out the intention of the legislature that enacted the statute. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). In attempting to identify that legislative intent, we look first to the text and context of the statute. *Id.* at 610-11. Where text and context satisfactorily identify legislative intent, further inquiry is unnecessary.

We believe that this is a case in which that first level of inquiry is the only one necessary, *i.e.*, the question before us may be resolved by text and context alone. ORS 307.130-(1)(a) directs that certain "literary institutions" be exempt from *ad valorem* property taxation, but it does not define what is meant by the term "literary institution," nor can the meaning of that term be divined from its statutory context. In interpreting a statute, however, "words of common usage typically should be given their plain, natural, and ordinary meaning." *PGE v. Bureau of Labor and Industries, supra*, 317 Or at 611. Accordingly, we look to the common meaning of the word "literary" to discern legislative intent in this case.

The common meaning of "literary" is "of, relating to, or having the characteristics of literature." Webster's

---

[1] Shakespeare, *King Henry the Fifth*, Act IV, scene 3.

Third New International Dictionary 1321 (unabridged ed 1993). "Literature," in turn, is "writings in prose or verse; *esp*: writings having excellence of form or expression and expressing ideas of permanent or universal interest." *Ibid.* Without question, the scripts of plays — both contemporary and classic — fit within those definitions of "literature." As this court has stated, "Literary societies are organizations for the propagation and spread of good literature * * *." *Kappa Gamma Rho v. Marion County*, 130 Or 165, 176, 279 P 555 (1929). We think that it follows ineluctably from the foregoing that an organization that is devoted to the production of plays that expose actors and audiences to those scripts is a "literary institution."

Although the foregoing discussion normally would be sufficient to establish that the Tax Court erred in its ruling in this case, one further consideration gives us pause. The pertinent portion of the statute under consideration in this case, ORS 307.130, predates Oregon statehood. The territorial legislature in 1854 enacted a statute that exempted from taxation "[t]he personal property of all literary * * * institutions." Such a provision has been a part of Oregon law ever since. It is conceivable that "literary," as the term was used at that time, had a more restricted meaning than it does at present. Therefore, in order to ensure that we are keeping faith with the probable understanding (and, therefore, the probable intention) of the 1854 enacting body, we have inquired into the use of the term "literary" around that time.

Our research has not found any indications that a legislator in the mid-nineteenth century would have understood "literary" to have a different and more limited scope than that term has today. Indeed, it appears that the term was being used in the comprehensive sense in which it still is used as early as 1734, when a young Samuel Johnson offered to produce an occasional column of a "literary" nature for the *Gentleman's Magazine. See* I Boswell, Life of Johnson 66 (Franklin Library ed 1983) (quoting letter from Johnson to editor of magazine). We conclude, from the evidence available, that the word "literary" meant in 1854 what it means today — of or pertaining to that broad range of written materials, including plays, that enjoy the label "literature."

The foregoing inquiry completed, our labors are at an end. Contrary to the conclusion of the Tax Court, the exemption from *ad valorem* property taxes provided in ORS 307.130 for "literary institutions" extends to taxpayer. For the purposes of that exemption, "the play's the thing."

The judgment of the Tax Court is reversed.