IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

COAST RANGE ASSOCIATION,       )
                                                       )
        Plaintiff,               )    TC-MD 160109N
                                                       )
        v.                       )
                                                       )
LINCOLN COUNTY ASSESSOR,     )
                                                      )
        Defendant.            )        **FINAL DECISION**[1]

Plaintiff appeals Defendant's denial of its application for property tax exemption under ORS 307.130 for property identified as Account R323645 (subject property) for the 2015-16 tax year. A trial was held in the Courtroom of the Oregon Tax Court in Salem, Oregon, on July 26, 2016. Charles Willer (Willer), Plaintiff's Executive Director, appeared and testified on behalf of Plaintiff. C. J. Hurtt (Hurtt), registered appraiser, appeared and testified on behalf of Defendant. Plaintiff's Exhibits 1 through 5, Plaintiff's Attachment to Exhibits 1 through 5 (Att), and Defendant's Exhibits A through H were admitted without objection.

## I. STATEMENT OF FACTS

The parties agreed that Plaintiff is a "nonprofit corporation" under ORS 307.130(1)(c)[2] because Plaintiff is organized under ORS chapter 65 and Internal Revenue Code (IRC) section 501(c)(3). There is no dispute in this case that the subject property is actually and exclusively used in Plaintiff's work. The only issue is whether Plaintiff is a "scientific institution" within the meaning of ORS 307.130(2).

Plaintiff's Bylaws identify its purpose as: "To protect the coast range forest from unwise

---

[1] This Final Decision incorporates without change the court's Decision, entered December 23, 2016. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

[2] The court's references to the Oregon Revised Statutes (ORS) are to 2013.

use while fostering a new vision of stewardship, diversity and long term sustainability. The purposes of the corporation are accomplished through education, research and the advocacy of environmentally sound management." (Def's Ex H.) Willer testified that Plaintiff actively engages in scientific research and education, focusing on salmon, watersheds, and forest management. He testified that Plaintiff's scientific fields are ecology and conservation biology, which he described as the study of biological diversity and the causes of species extinctions. Willer testified that the goal of preventing species extinctions is explicit within the discipline of conservation biology; he compared it to the goal of promoting health in the medical sciences.

Willer testified that Plaintiff was formed in 1991. In that year, Willer contacted Dr. Reed Noss, Ph.D. (Noss), a conservation biologist. They discussed a research concept to study biodiversity in the Oregon coast range forest. (*See* Ptf's Att 1 at 1.) Willer testified that he wrote a grant for the research project, and the resulting publication by Noss, entitled *Coast Range Biodiversity Conservation Plan*, was "the first biodiversity plan developed in the western United States and became a model for future work by scientists and organizations working in conversation biology." (*Id.*) Willer testified that Noss' publication was utilized in the federal Northwest Forest Plan (NWFP) as the "best available science." He testified that the NWFP is an amendment to a regional management plan responding to the listing of several species (spotted owl and salmonids) under the Endangered Species Act (ESA).

A.      *Plaintiff's Research and Educational Activities*

Since its formation in 1991, Plaintiff has published at least 15 reports, handbooks, and other documents on topics in conservation biology. (*See* Ptf's Att; *see also* Exs 1-5.) Willer testified that he authored and co-authored some of the publications on behalf of Plaintiff. (*See* Ptf's Att; *see also* Exs 2-4.) He testified that other publications were authored by scientists who

worked as independent contractors for Plaintiff. (*See, e.g.*, Ptf's Ex 5.) Willer provided copies of several of Plaintiff's reports, described below. (Ptf's Exs 1-5.)

In 1998, Plaintiff "developed a science-based watershed assessment handbook for use by the State of Oregon and municipal watershed councils in assessments of limiting factors affecting salmonids production." (Ptf's Att at 1.) It also "produced a citizen guide to watershed assessment titled, Strategically Approaching Salmon Protection in Coastal Watersheds: A Guidance Manual for Watershed Residents." (*Id.*; Ex 1.) Willer testified that that guidance manual is used by local communities. He testified that watershed councils engage in a variety of activities to improve stream quality, such as replacing culverts and removing dikes. Willer testified that Plaintiff identified priority sites for that work. He testified that Plaintiff has received positive feedback from watershed councils that they have found its manual is useful.

In 1999, Plaintiff "conducted original research and analysis" on forest rotations with the assistance of "research foresters at the Siuslaw National Forest." (Ptf's Att at 1.) It published an economic analysis of forest rotations in a booklet entitled "Forests that Work." (*Id.*; Ex 4.)

In 2001, Plaintiff reviewed and compiled existing data on stream habitats, coastal Coho salmon populations, and property ownership, from which Plaintiff "discovered relationships between forest management, stream habitat conditions and salmonids populations." (Ptf's Att at 2.) Plaintiff published its findings in the report "Forestry & Salmon: A Report on Oregon's Coastal Watersheds and the Need for Forestry Reform." (*Id.*; Ex 2.)

In 2008, Plaintiff "managed the research and analysis of a report on the economies of Oregon's coastal counties." (Ptf's Att at 2.) The lead author of the resulting report was Paula Swedeen, Ph.D., Ecological Economics, and Willer was a co-author. (*See id.*; Ex 3.)

/ / /

In 2013, the "Forest Service announced new forest planning [would] occur for 13 Northwest and [California] national forests. Independent of the agency, many aquatic and fisheries scientists were unsure how scientifically valid the [NWFP] Aquatic Conservation Strategy (ACS) remained." (Ptf's Att at 3.) Willer testified that, in order to supply the Forest Service with the best available science, which is required by law, Plaintiff "contracted one of the nation's leading aquatic scientists, Dr. Chris Frissell, Ph.D. (Frissell), to review the aquatic science questions confronting the Forest Service." (*Id.*) Plaintiff "published a preliminary report by Frissell" that "framed up the science questions that might be answered about the ACS by an independent science review panel." (*Id.*) Willer testified that Plaintiff raised funds to commence a study of the ACS and draft a peer-reviewed report. He testified that Plaintiff sponsored a two-day panel held in Portland in December 2013 featuring "ten of the Northwest's leading aquatic scientists" to discuss "25 years of new science relevant to the ACS." (*Id.*)

In 2014, the members of that panel worked with Frissell to write a science review of the ACS. (Ptf's Att at 3.) On August 15, 2014, Plaintiff published the resulting report; it is entitled "Conservation of Aquatic and Fishery Resources in the Pacific Northwest: Implications of New Science for the [ACS] of the [NWFP]." (*Id.*; Ex 5.) Over 1,000 copies of that report have been downloaded from Plaintiff's website. (Ptf's Att at 4, 5)

Willer testified that Plaintiff tries to publish reports that are readable. He testified that Plaintiff's publications are all available for free to the public; the preface of such publications.[3] Willer testified that Plaintiff receives funding from grants and individual donations, which it uses to conduct scientific research and publish educational materials. He testified that Plaintiff's funding sources do not control the outcome of any of Plaintiff's research.

---

[3] *See e.g.* Ptf's Ex 5 at 2: ("Permission is granted to reproduce [Ex 5] for public benefit, non-commercial purposes.")

B.      *Plaintiff's Advocacy*

Hurtt testified that Defendant determined that Plaintiff does not qualify for property tax exemption as a scientific organization based on its advocacy.  He testified that he thought Plaintiff was similar to the plaintiff-entity in *Native Forest Council*, 17 OTR 30 (2001).  Hurtt provided printouts from Plaintiff's website and pointed out some partisan rhetoric on the website, such as references to "mill owning elites," the "fake county revenue crisis," "timber interests," and "[i]n cahoots with the Bush administration."  (Def's Ex A at 1.)  He testified that, based on that type of rhetoric, it appeared to Defendant that Plaintiff has an agenda that outweighs Plaintiff's scientific and educational purposes.  Hurtt noted that some of that language (*e.g.,* "corporate cut-at-the-earliest-convenience forestry" and "elite investors") appears in Plaintiff's publication discussing forestry rotation schedules.  (*See, e.g.,* Ptf's Ex 4 at 2.)  As another example of Plaintiff's advocacy, Defendant provided a copy of a letter to the Secretaries of Agriculture and the Interior signed by numerous conservation organizations including Plaintiff. (Def's Ex C at 1.)  The letter concerned the ACS and NWFP, and cited Frissell's research paper. (*See id.*)

Hurtt asked Willer about Plaintiff's involvement in litigation.  Willer testified that Plaintiff has never been a litigant in a timber sale, but it has been a litigant in a case involving endangered salmon.  He testified that, in 1994, the National Marine Fisheries Service listed endangered salmon stocks under the ESA, but left out Coho salmon.  Willer testified that Plaintiff pursued litigation to list Coho salmon under the ESA and prevailed.  He testified that Plaintiff was not the lead plaintiff in that litigation.  Willer testified that Plaintiff's reports are supported by facts and research.  He testified that Plaintiff employs no lobbyists.

/ / /

## II. ANALYSIS

The issue presented is whether Plaintiff was a "scientific institution" within the meaning of ORS 307.130(2) for the 2015-16 tax year. "Generally, all property located within Oregon is taxable." *Living Enrichment Center v. Dept. of Rev*., 19 OTR 324, 328 (2007) (citing ORS 307.030 (2003)). "It has long been the rule in Oregon that property is subject to taxation unless specifically exempted." *Id*. (quoting *Christian Life Fellowship, Inc. v. Dept. of Rev*., 12 OTR 94, 96 (1991)). Statutory exemptions are strictly construed in favor of the state and against the taxpayer. *North Harbour Corp. v. Dept. of Rev*., 16 OTR 91, 94 (2002) (citing *Mult. School of the Bible v. Mult. Co*. (*Mult. School of the Bible*), 218 Or 19, 27, 343 P.2d 893 (1959)). This rule of construction means "strict but reasonable[,]" which "requires an exemption statute be construed reasonably, giving due consideration to the ordinary meaning of the words of the statute and the legislative intent." *Id*. at 95 (citing *Mult. School of the Bible*, 218 Or at 27-28). As the party seeking relief, Plaintiff bears the ultimate burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971).

Plaintiff asserts that subject property qualifies for exemption from property taxation because it meets the statutory requirements of ORS 307.130(2), which provides, in pertinent part, that:

> "Upon compliance with ORS 307.162, the following property owned or being purchased by art museums, volunteer fire departments, or incorporated literary, benevolent, charitable and *scientific institutions* shall be exempt from taxation:

> "(a) Except as provided in ORS 748.414, only such real or personal property, or proportion thereof, as is actually and exclusively occupied or used in the literary, benevolent, charitable or *scientific work* carried on by such institutions."

ORS 307.130(2) (emphasis added).

Thus, for Plaintiff to satisfy the requirements of this exemption statute: (a) its entity must be a "scientific institution", and (b) it must exclusively use the subject property in carrying out its *scientific work*. The parties agree that Plaintiff meets the second prong of this test.

A.      *Scientific Institution*

The Oregon Supreme Court described scientific organizations in the context of ORS 307.130:

> "Scientific societies are usually and ordinarily understood to embrace organizations for the promotion of science or the pursuit of scientific studies for the purpose of developing science, rather than as a student in a college or university for his own edification."

*Kappa Gamma Rho v. Marion County*, 130 Or 165, 176, 279 P 555 (1929); *see also Math Learning Center v. Dept. of Rev.*, 14 OTR 62, 64 (1996) (applying the definition of "scientific organization" in *Kappa Gamma Rho* for purposes of exemption under ORS 307.130). More recently, the Regular Division of this court rejected the contention that

> "a scientific institution, or stated differently, an institution entitled to an exemption under the scientific prong of ORS 307.130, must carry on 'scientific work.' Rather, exemption is also available for property used to educate or expose the public to scientific concepts, events, principles and the application of science to the problems and opportunities of human life."

*Evergreen Aviation and Space Museum v. Dept. of Rev.*, 22 OTR 1, 6 (2014).

Plaintiff alleges that it is a scientific institution, engaged in scientific work in the fields of ecology and conservation biology. *Webster's Third New International Dictionary* defines "ecology" as "a branch of science concerned with the interrelationship of organisms and their environments [especially] as manifested by natural cycles and rhythms, community development and structure, interaction between different kinds of organizations, geographic distributions, and population alterations." *Webster's Third New Int'l Dictionary* 720 (unabridged ed 2002). Willer described "conservation biology" as the study of biological diversity and the causes of species

extinctions. The court is persuaded that conservation biology and ecology are sciences. To the extent that Plaintiff engages in research and education with respect to those fields, those activities support a finding that Plaintiff is a scientific institution within the meaning of ORS 307.130(2).

Defendant did not challenge the status of conservation biology and ecology as sciences, but rather focused on Plaintiff's advocacy activities, concluding that they overshadowed Plaintiff's research and educational activities. As evidence of that conclusion, Defendant noted some partisan rhetoric on Plaintiff's website and its advocacy of policy positions regarding the NWFP and ACS. Defendant relied primarily on *Native Forest Council* to support its conclusion that Plaintiff is not entitled to property tax exemption as a scientific institution.

> *Native Forest Council* involved a non-profit organization with the following purpose:
>
> "The fundamental objective of the Council shall be educational in nature and shall be essentially concerned with the preservation and protection of public forests which still remain in their native or untouched state throughout the nation. An additional objective shall be the restoration of such native forests in areas of the country where they no longer exist."

17 OTR at 31-32. The organization sought exemption as a "charitable institution" under ORS 307.130(2). The court concluded that the organization's primary purpose was *not* charity; rather, it was "organized to promote a political ideology by educating the public." *Id.* at 35. The court further reasoned that "[c]harity must be more direct and substantive to the recipient." *Id.* Furthermore, the court found that the organization's performance did not involve sufficient "gift or giving," although it circulated its newspaper for free. *Id.* at 36.

*Native Forest Council* is not persuasive in this case because it involved the requirements for an organization to qualify as a *charitable* institution under ORS 307.130(2), not as a *scientific* institution. *See Math Learning Center*, 14 OTR at 65 ("Although a scientific organization must

be in the nature of a public charity, it is distinguishable from a charitable organization. A charitable organization must have charity as its primary, if not its sole, object. * * * A literary or scientific organization has a different primary purpose.")

Hurtt testified that Defendant disallowed Plaintiff's exemption because of Plaintiff's advocacy of a viewpoint supporting preservation of species and conservation of natural resources. Although qualification for tax exemption under IRC section 501(c)(3) is not sufficient for property tax exemption under ORS 307.130(2), some of the qualification requirements are worth noting here. IRC section 501(c)(3) exempts from taxation corporations "organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes * * *." Exemption may not be granted to such an organization if a "substantial part of the activities * * * is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h))" or if the organization "participate[s] in, or intervene[s] in * * * any political campaign on behalf of (or in opposition to) any candidate for public office." IRC § 501(c)(3).

Treasury Regulations promulgated pursuant to IRC section 501(c)(3) define "scientific" and "educational" for purposes of that code provision. A "scientific" organization "must be organized and operated in the public interest" and includes organizations conducting "scientific research in the public interest." Treas Reg § 1.503(c)(3)-1(d)(5). The term "educational" includes both "[t]he instruction or training of the individual for the purpose of improving or developing his capabilities" and "[t]he instruction of the public on subjects useful to the individual and beneficial to the community." Treas Reg § 1.503(c)(3)-1(d)(3)(i).

> "An organization may be educational even though it advocates a particular position or viewpoint so long as it presents a sufficiently full and fair exposition of the pertinent facts as to permit an individual or the public to form an

independent opinion or conclusion. On the other hand, an organization is not educational if its principal function is the mere presentation of unsupported opinion."

Treas Reg § 1.503(c)(3)-1(d)(3)(i).

Thus, in order to qualify as a tax-exempt organization under IRC section 501(c)(3), Plaintiff was required to meet the requirements in the IRC with respect to its advocacy activities. As the Treasury Regulations make clear, an organization engaged in educational activities may advocate a particular viewpoint so long as it "presents a sufficiently full and fair exposition of the pertinent facts as to permit an individual or the public to form an independent opinion or conclusion." That Plaintiff qualified for and received tax exemption under IRC section 501(c)(3) provides some assurance that Plaintiff is not engaged in impermissible political advocacy.

This court has previously determined that a nonprofit organization qualified for property tax exemption as a scientific organization even though it was involved in rule- and policy-making. *See Experimental Aircraft Ass'n Chapter 292 v. Polk County Assessor*, 16 OTR 183 (1999). In that case, the plaintiff was an aviation association organized for a variety of purposes, one of which was "to cooperate with and assist governmental agencies in the development of programs relating to aviation activities." *Id.* at 184 (internal quotation marks omitted). In furtherance of that purpose, the plaintiff "assist[ed] in the promulgation and distribution of rules and policies controlling aviation, at both a federal and local level." *Id.*

To the extent that Plaintiff's research and publications are aimed at assisting governmental entities achieve existing policy goals and comply with existing law (such as the ESA), Plaintiff's activities are not fundamentally different than those of the plaintiff in *Experimental Aircraft Ass'n*. It is evident that Plaintiff's website and some of its educational publications include partisan rhetoric, perhaps designed to attract passionate donors. However,

the majority of Plaintiff's publications are educational and scientific such that the court is persuaded that Plaintiff's primary purpose is to engage in scientific research and education. Plaintiff qualifies as a "scientific institution" under ORS 307.130(2).

B.    *Charitable Objective*

> "Being a scientific institution, however, is not enough to qualify for an exemption.  In *Theatre West of Lincoln City, Ltd. v. Dept. of Rev.*, 319 Or 114, 117, 873 P2d 1083 (1994), the Oregon Supreme Court stated that a literary or scientific institution cannot qualify for an exemption under ORS 307.130 'unless a significant portion of its activities have a charitable objective.' "

*Math Learning Center*, 14 OTR at 65.  "The underlying rationale for this is that tax exemption is given in return for the performance of functions that benefit the public."  *Id.*

In *Math Learning Center*, the court concluded that the plaintiff's activities involved sufficient charity to qualify for property tax exemption, even though the plaintiff conducted its "activities in a business-like manner" and "had a gross income of over $6,000,000" in the tax year at issue.  14 OTR at 53, 66-67.  The plaintiff's qualifying charitable activities included: training workshop leaders at its own cost, providing tuition waivers for home school instructors, providing support for teachers on special assignment, and funding "minority projects."  *Id.* at 66.

In *Oregon Writer's Colony v. Dept. of Rev.*, 14 OTR 69, 74-75 (1996), the court examined "five different aspects" of a qualified literary organization to determine if it was "operating for the public good": (1) membership; (2) property ownership and use; (3) administration; (4) activities; and (5) public welfare.  A theme running through each of those aspects was public access to the organization's services and benefits.  *See id.*  The primary purpose of the organization must be public, rather than private, benefits.  *See id.*

The parties in this case did not discuss this issue at trial, so the available evidence on Plaintiff's charitable activities is limited.  Willer testified that all of Plaintiff's publications are

available to the public for free. The publication authored by Frissell was downloaded from Plaintiff's website over 1,000 times. Plaintiff published a watershed assessment manual specifically for use by citizens and to aid local watershed councils. Each are public benefits. No evidence was presented to support a finding that Plaintiff's benefits are limited to a closed group of members. The court is persuaded that Plaintiff's activities involve sufficient charity to quality for property tax exemption under ORS 307.130(2).

### III.  CONCLUSION

After careful consideration, the court concludes that Plaintiff was a "scientific institution" within the meaning of ORS 307.130(2) and the subject property is entitled to property tax exemption under that statute for the 2015-16 tax year. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is granted.

Dated this ____ day of January, 2017.

ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by __mailing__ to: 1163 State Street, Salem, OR 97301-2563; or by __hand delivery__ to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within __60__ days after the date of the Final Decision or this Final Decision cannot be changed.  TCR-MD 19 B.*

*This document was filed and entered on January 13, 2017.*